does for the Middle District and started his career as a law clerk for the great Jerry Choflat. It's great to have him back with us. As I said, we have two appeals to hear this morning. We're familiar with your cases, counsel. You should feel free in the limited time available to you to get straight to the heart of your argument. We've read your briefs, authority cited in your so we're familiar with your case. When the red light shines, it's time to stop. If you're answering a question from the court, you can finish your answer, but please be mindful of our time. So we'll begin with United States v. Touset. Mr. Wolfe, will you come speak with us, please? Yes, sir. Good morning. I'm David Wolfe, and this is Bingzi Hu, a lawyer with my office who is working with me. She was one of my students in my law school. She's here from Beijing, China, and she's practicing in the Northern District now. As I begin my argument to the court, um, the lower court adopted the, um, standard in Cotterman, um, in making its ruling, and that was not appealed by the government. Do you want me to go? They don't have to appeal. No, I understand. This is sometimes a matter of confusion in our court. They won. They can make any argument that is supported by the record, and as I understand it, they are arguing that not even reasonable suspicion is required. So both of those issues, as I understand it, Mr. Wolfe, are in play. Whether reasonable suspicion is required, and if so, whether reasonable suspicion was present here. Yes, sir. And in fact, a similar circumstance happened in Cotterman where there was a big discussion as to whether or not it was raised and it could be gone into, but I'll go into it with the court. Certainly when Mr. Toussaint was returning to this country, Mr. Toussaint was a United States citizen, his file had been flagged based upon an investigation that began in October of 2014. This was December 21, 2014. He came in, and because the file was flagged, he was subjected to the, um, basic search that any individual crossing our borders is allowed to, is required to submit to if approached. When he was approached, they asked to look at his property. They searched his suitcases and essentially found nothing that was contraband. So we've held that border agents can search luggage without suspicion, mail without suspicion, a crew member's quarters on a vessel, which we explained is a home for Fourth Amendment purposes, without suspicion. The Supreme Court has held that you can disassemble a fuel tank in a car to search for contraband at the border. Why is it that reasonable suspicion would be required for a forensic search of electronic devices? Well, when you speak of disassembling a gas tank, I think that's what the court talked about in Riley in explaining the distinctions and exactly what was said in Riley is why there should be... Riley's a case about a search incident to arrest within the United States. It's not a border search case. Absolutely. I understand that, but the... All of the precedents I'm talking about, though, are border searches, and we've said no reasonable suspicion even required for those. Okay. And what I'm trying to express to the court, that there is no reasonable suspicion or anything necessary for the initial search. I understand where the court is going. When they went on Mr. Toussaint's electronic equipment, they didn't find anything, but they were instructed based upon an investigation that had gone on that actually revealed nothing tangential to child pornography. Agent Ford directed them to detain the property and send it off to be forensically searched. The reason I went to Riley and that I think Riley is significant is because a computer is not your grandfather's briefcase, which was subject to all of the scrutiny that the court just talked about with you can read all the private letters and all the things that are contained in it. Well, why would we... If we say you can search mail without suspicion, private mail, if we say you can search a crew member's home, his cabin on a vessel without suspicion because that search occurs at the border, why is a forensic search of an electronic device different? Because as the court said in Cotterman, of all of the accessibility of information protected by the targets of the Fourth Amendment by the founders, your papers and your effects... What's more private in your papers or effects than your mail? And if you bring your mail with you on to the... In your briefcase on the cruise, they have the right to examine it, Judge, just like if you do. I know. I'm trying to understand though. I understand. I think you're right. At the time of the founding, the Fourth Amendment would have understood papers and effects, things like your mail, your home as receiving the highest protection. But border searches have always been different as I understand it. And I'm having a hard time understanding why this electronic device would get higher protection than we would give a home or mail at the border or your luggage. Well, when you say a home, you're talking about a boat that's attempting to come into the community. They can't take... This person lived, right? We ruled that because the crew member lived there, this was his living quarters. It was for Fourth Amendment purposes, his home. Well, it was his home and it was attempting to come into the United States where you had the right to search to make sure that it wasn't bringing anything in that was contraband. And I understand that. And a phone can bring... An electronic device can bring in child pornography, which is contraband, right? Well, the question in the other cases is, does that child pornography exist on the computer itself? Has it been deleted and discarded and you have to go into the unallocated space so that you can make a determination as to whether child pornography was ever possessed? Was it possessed by him? Was it possessed intentionally? All of those sorts of things. But you can't go to Carl Two-Set's house and search his house. What you're attempting... We held in the crew member's case that you could because it was at the border. Right. That was a child porn search. It was a search for contraband in his living quarters on the vessel. It occurred at the border and we held no reasonable suspicion required, right? Well, that is what you held, yes. But he was trying to bring his house into this country. And there's a difference there. You have the right to search the briefcase and the different things that are apparent. And when you go through the computer during that initial... That was trying to bring electronic devices into this country, right? Right. And they made a cursory search of it. They turned it on. They examined the content of the things that were apparent to them. You know, Judge, all this stuff is historical also. I'm not saying that they are limited to searching the computer for the 11 days that you were gone. They're allowed to turn on the computer and search it in order to get to the detailed information from a forensic analysis. That's the thing that we believe has to be susceptible to some modicum of a standard-like probable cause in the Fourth Amendment. And if it's a reasonable suspicion, which a number of the other courts have adopted, then so be it. And the question becomes, was there a reasonable suspicion here? If the court's premise is that we can search and do any type of search that we want to because of the precedent that was established based upon people walking into the country without these types of devices. In fact, Homeland Security has changed their standard and said, you can't search electronic devices in 2018 with forensic equipment unless you have a reasonable suspicion. So they've come into the 21st century from when people used to come in carrying the things that were susceptible. Where is that? Is that in the record? I didn't see that. You're talking about Homeland Security. Right. Well, in 2018, they changed the standards for a basic search and an advanced search dealing specifically with this particular issue. How are we to know that? Is that in the record or is that published in the Federal Register? I think it is published federally, yes. It was a DHS CBP PIA border search electronic device directive. So I'm just alluding to the fact that they have gone farther than it was before simply because of the change in circumstance. I think that Katterman alludes specifically to what Justice Scalia had said when he said computers allow us to carry the very papers once stored at the home. And it would be foolish to contend that the privacy afforded by the Fourth Amendment has been unaffected by the advance of technology. That's in the Katterman case. And that is certainly the premise that we're operating under. If, in fact, the court is searching, that's true. Well, but to be honest with you, Judge, a strip search seems to me to be more of a Puritan, gosh, I don't want to be seen naked when, in fact, they can't look into your mind if they look into your electronic equipment and do the type of strip search that forensic analysis does. They're learning all of your intimacies, your medical history, your proclivities and all of the things that seem to be so vehemently protected by the Fourth Amendment when just taking your clothes off seems to be something that you need to do a second step with. And if that's the case, what you are doing is stripping the person that owns that computer bare and seeing not only his body, but his thoughts, his innermost interactions, and the things that are most private to him and that were the target, as we discussed a moment ago, of the Fourth Amendment when it was originally enacted to protect the home, his papers and effects. Thank you. Let's hear from Ms. McBath. May it please the Court. My name is Elizabeth McBath, appearing on behalf of the United States. Searches that occur at our border are reasonable under the Fourth Amendment by virtue of the simple fact that they are occurring at our border. And this is true because... You know about this Homeland Security Director that he referred to? Yes, Judge, I did. It was, um, it was enacted on January 4th of this year. What is it? It's an internal policy, um, I have it right here. I don't believe it's a wreck. It's an internal policy directing, um, giving guidance, giving guidance to border patrol officers on the ground nationally. And it says that, um, it, it differentiates between a search and an advanced search. And an advanced search is where you have to, um, a forensic search here, essentially. And it does say that custom border patrol officers should have reasonable suspicion before forensically examining something for contraband. Um, or you can forensically, um, examine if there's any type of national security concern. But we have two responses to that policy existing. One, it's sort of a belt and suspenders approach that CBP has taken in light of, it's not officers in the Ninth Circuit do need reasonable suspicion. And that, there's a lot of border in the Ninth Circuit. There's a lot of border in the Ninth Circuit. And this directive goes to all, uh, border patrol officers. In addition, an internal, um, directive to officers on the ground, on the policy that they're going to take does not affect Fourth Amendment analysis. It doesn't affect our Fourth Amendment jurisprudence. And that jurisprudence is clear here. When you apply this court's precedent and the Supreme Court precedent, while this court hasn't considered the precise issue here, when you apply that precedent, it compels the conclusion here that no reasonable suspicion is necessary. The government below agreed to the reasonable suspicion standard. Why is, why on appeal is the government going beyond that? You're, you're right, Your Honor. We did not. We felt strongly then as we feel strongly now that reasonable suspicion existed. And so I believe it was our thought that, um, for judicial efficiency and judicial economy, there was no need for the court below to engage in what is a complex legal analysis. Now that we are on appeal, um, we recognize that this is a constitutional, a complex constitutional issue that's percolating, percolating among the circuits. The Ninth Circuit has ruled. The Fifth Circuit is examining. There's a case pending right now in the Fourth Circuit. And whatever the district court ruled in this case was not going to be precedential. But now that we're here, whatever we rule could be precedential if we, if we, if we so rule in a published opinion, right? That's right, Your Honor. And that's why we because our district courts do need guidance on this. This is an issue we're seeing a lot. And so we would ask if this court is inclined to provide guidance in this case to the district courts around our circuit, I think that that would be very helpful. Yeah, I don't mean to, um, I never mean to offend our district judges, but they don't make law, right? That's one difference, right? That is. So if this court could provide guidance, that, that would be helpful. And I think to provide that guidance, this court has the precedent it needs to hold no reasonable suspicion as necessary here. And I surely agree. We don't. But it, why did the government take the position? Why didn't the government argue to the district judge the same thing that they're doing? I, the best answer I can give you, Your Honor, is that we felt like it was, at that point, it was irrelevant because under whatever standard the court applied, reasonable suspicion existed, and there was no reason to exclude this evidence. So there are two precedents that I'd like to point this court to. And I, if I understand the defendant's argument correctly. Let me just ask you one other question. It's something I never quite know. Is the decision, so you said once it got on appeal, you decided to, to take the position that no, no justification whatsoever is required, essentially is the position, right? And is that a position that is adopted by the U.S. attorney in this district? Is that a DOJ? In other words, how does the government decide what it's going to argue today? So when this case made it to this court, different government agencies contacted us. This is on their radar. CBP contacted us. HSI contacted us. And they said this is very important to us. And they let us, they made us aware of these other cases around the country. We have talked to these agencies. We have also talked to the DOJ, the people who do our cyber crime and also border cases. This is something that you would have consulted with the Solicitor General's office about, isn't it? Yes. Yes, Your Honor. I believe we have because there's a consistent, there's a consistent argument that AUSAs around the country are taking in our circuit courts. And that is that no reasonable suspicion is necessary for a forensic exam of a computer or any electronic media at the border. And so let me just make sure I understand what that position is. So any American citizen who travels abroad and returns to the United States for whatever reason is subject to having their electronic devices detained, in this case for three weeks, and forensically searched without any justification necessary. Correct. And that is true because we are at the border. And that is true because the government, the reason for the border search exception, which exists prior to the Fourth Amendment, is that we, society, has a right to protect ourselves, protect ourselves from contraband entering this country and protect ourselves against people who wish to do us harm. Now, if I understand... Our presidents have said the same is true when you're, when a citizen is coming back to the country and their, their motor vehicle is kept for some period, disassembled and searched for contraband, right? That is correct. Though the citizen might really need that motor vehicle, right? Right. And we've said the same about mail coming into the United States, right? Correct, correct. We said the same thing about the crew members home for Fourth Amendment purposes? Yes, yes. All searched without reasonable suspicion, right? All searched without reasonable suspicion. The only time this circuit has ever held reasonable suspicion is required is for a strip search, an invasive search of an individual's body. Is that right? That is correct. And that is the same thing with the Supreme Court as well. This court, no court, has ever required reasonable suspicion for a property search. And that's because, again... For the Ninth, right? Correct. I'm sorry, I misspoke. I meant this circuit or the Supreme Court. Right. Except for the Ninth. You said no court. I know, and I misspoke. Sorry about that. And, and is, is the percolation that's going on, if, if that's what we're talking about, is, has there ever been any other cases argued, decided in these other cases? Where, where does, where does the whole thing stand? So we have Cotterman. This court, Judge Pryor, heard oral argument in a case out of Florida, the Middle District of Florida. Vergara? Vergara. In that case, a little bit different. The defendant framed the argument as wryly now requiring a warrant. Yeah, that's a probable cause warrant argument, right? Right. The Fifth Circuit on March 1st issued an opinion in Molina Isadora. A little bit of a different, there wasn't a forensic analysis in that case. Officers found heroin secreted in the border, in the border crosser's suitcase and did a cursory search at, on her applications, the WhatsApp application. In the court, the court found that the good faith exception applied in that case. So it doesn't provide too much guidance, but it was an issue that was briefed and argued. Currently, there is a case on point in the Fourth Circuit, and we're waiting for an opinion. And in that case, the facts are on fours as this one, that there was a forensic exam, an off-site forensic exam of a computer of someone, actually that person was leaving the country. Now, I, if this court wants, I said that the Solicitor General, you think, but you're not sure, has, has consulted. If we rule the way you ask us to rule, I would be troubled if the Solicitor General comes back and says, oh, you know, I'm not, I'm not down with that particular approach. Are we sure that the Solicitor General is also in accord with your approach? So we, we personally have not spoken with the Solicitor General's office. We spoke to someone from DOJ who told us they have spoken to the Solicitor's, Solicitor General's office. We know that we are all making the same argument around the country. There is a mandate to us to take this position. I would be surprised if the Solicitor General changes course, if this case, or if this issue eventually ends up in the Supreme Court. And are you saying the directive that went out in January that requires reasonable suspicion, are you saying that that is an effort to comply or to insulate the issue from problems until a definitive court ruling is made on the issue? I think that's exactly right. And there's actually, not dissension, but there's a difference of opinion among the different agencies. So HSI has not adopted the same directive. But, but, but it certainly is prudent to tell border agents to have reasonable suspicion if that's the law of the Ninth Circuit and that's a huge portion of the border of the United States. Absolutely. And let me be clear that CBP does not agree with Cotterman in the least. But given that Cotterman exists and to make sure that they are protecting their interest as much as possible, they are, they issued that directive. And can you, can you just talk for a minute about Riley and what Riley either does or doesn't say about this issue? So Riley does examine cell phones, but Riley is not in a border search context. It's a search incident to an arrest. And that is the critical distinction here. Riley does spend a good portion of time explaining how cell phones and also computers can hold more information and can perhaps hold more sensitive information than say a briefcase. But even those points of differentiation do not matter in this border search context. In fact, it only heightens the interest for border patrol officers to be able to search these devices. What are the outer limits from your point of view of how long the government can hold? Somebody comes through with an iPad or whatever they have, a manual look, want to look a little further, want to have a forensic check. Can they hold it for six months, a year? When do they have to get their iPad back? Right. There's a statute that controls, that explains to border agents what they can and can't do. So they must by statute decide within five days if they're going to give it back or conduct a search. Once that decision has been made within five days, they have 30 days to conduct their search and make a decision if they are going to at that point seize it. So if they find contraband, they can seize it or give it back. If Cotterman's right, is there reasonable suspicion here? Yes, Your Honor, there is more than ample reasonable suspicion. As the magistrate court recognized, there is more reasonable suspicion in this case than there actually was in Cotterman. So this case started with the private sector. Zoom, which is a money transmittal company, became aware that there was a group of individuals who were sending small amounts of money to individuals in different countries, the Philippines, Thailand, and the Dominican Republic, and this raised a red flag for them. They contacted NCMEC and Yahoo, and they contacted Yahoo because this group of individuals had Yahoo email accounts. Yahoo then conducted their own internal investigation and they found that one of those emails that Zoom had given them had at one point possessed, distributed, or received child pornography. And they also discovered that the person who created that particular email account, the I Love You So Much email account, had given Yahoo a phone number that resolved to the Philippines. They also discovered that this particular email account had communicated with another email account with the name Carl HHT at Yahoo.com. So Yahoo then goes back to NCMEC. NCMEC notifies the Cybercrime Center of HSI. HSI then sends a summons to Western Union because they want to look at this I Love You email account. They want to know who has this email account been communicating with, who has been sending money to this email account. Can I apologize? Can I just ask you a question? Because there's three payments that were made from the defendant to this outfit, and that's one of the things that tied it together for them. So they put them on a list. Tell me briefly, I know you're running out of time, but tell me briefly about this list. How long does it last and how many people are on it? Well, I believe, so the cybercrime, HSI was notified because the defendant wasn't in this country. He has, I believe, dual citizenship. But we knew he was not here, he was in Europe. And so because of that, we knew he also lived here. So we knew he would be coming back into the country. So there was a flag. And this was a matter of months when we learned this from Western Union and when he reentered the country. I see my time is up. Thank you, Ms. McBath. Mr. Wolf, you've saved four minutes for rebuttal. I should have saved 14. First of all, with regard to the border, you know, Atlanta is the busiest airport in the world and is one of the busiest international airports in the world and has a substantial number of passengers. Mr. Toussaint was not randomly stopped. He was targeted based upon the information the government attempted to share with you just a moment ago in the motion to suppress hearing. I mean, that information is just patently wrong. We were not identified by the original Zoom investigation. We were not identified by Yahoo. We in fact, when I asked the court, when I asked the witness, do you have any information that Carl Toussaint ever possessed or received child pornography in any manner? She said at this time, no. And this was after, of course, the seizure had done it, the motion to suppress. Did you ever have any indication that he communicated in any respect or had any connection to the I love you so much email address involving transmitting child pornography? No, is the answer to that question. Isn't it? I understand what you're saying. And, you know, we can debate reasonable suspicion, but the fact that you're saying he was targeted, isn't it for Fourth Amendment purposes, isn't it better that there was reason to do it, whether you think the reason was good enough or not, as opposed to just randomly doing it? Isn't it better that he was targeted in some ways? Well, yeah. Well, he was targeted. No, for the government, it's better. He was targeted and the flag was put on his passport because they didn't have probable cause and they couldn't get warrant to search him because they had no nexus between Carl to set and child pornography whatsoever. And that's what the agent testified to at the hearing. And with regard to the image, the image was. But from a reasonable suspicion standpoint, if reasonable suspicion is the test and that's a debate, of course, in this case, but isn't it better that the government have some reasons? That's why you have reasonable suspicion test, right? Yes. And I didn't get an opportunity in much detail to explore that, but their reasonable suspicion was based upon nothing. They had a hunch. They had a hunch. And that's all that they had. That's number one. Number two, you have to remember with the probable cause or Fourth Amendment analysis, you have to have a reasonable suspicion. If that's the standard that not only that the person possessed the contraband that you were and it has to be at the location that you're trying to search. And in this case, there is no evidence of electronic anything by Carl to set until he got to the airport and they took his computer. So it's a two prong test. And if you have a reasonable suspicion that somebody is dealing drugs, that doesn't mean you can go to his house unless you can establish a nexus between the drug dealing that you have probable cause for and the search of his home. And in this case, we just don't have it. Well, and with regard to the motor vehicle, the motor. But what about the fact that they had there were three small payments made to this outfit from your client? Wasn't made to this outfit, Judge. In fact, the testimony at the hearing was we don't know if the entity was an individual or the recipient was an individual or an entity. They don't know where it went. They don't have the Western Union transmittal forms. They have no evidence other than what somebody told somebody else that the telephone is connected to the I love you so much email address, which had a single image. There was no evidence of transmitting child pornography of quote, unconfirmed child pornography. So so what we have here is a and they did a strip search of his computer without probable cause and without a reasonable suspicion. Thank you. Thank you. We have your case and we'll now hear the final case.